UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ARRELLO BARNES,

                                        Plaintiff,

                              v.

FEDELE, et al.,

                                       Defendants.

DECISION AND ORDER

07-CV-6197L

_____

Plaintiff Arrello Barnes, proceeding *pro se*, brought this action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Plaintiff sued a number of officials and employees of the New York State Department of Correctional Services ("DOCS")[1], asserting various violations of his rights under the First Amendment to the United States Constitution to the free exercise of religion.

In February 2014, the Court granted defendants' motion for summary judgment, denied plaintiff's cross-motion for summary judgment, and dismissed the complaint. Dkt. #164; 2014 WL 11460504. On appeal, the Court of Appeals for the Second Circuit reversed in part and vacated in part this Court's decision, and remanded the case for "further proceedings and development of the record" as to one particular issue: defendants' denial to plaintiff of a "Tsalot-Kob," which is a head covering, also known as a "crown," which is worn for religious

---

[1] DOCS has been renamed the Department of Corrections and Community Supervision ("DOCCS"). Since the relevant events in this case occurred before that name change, the Court will use "DOCS" throughout this Decision and Order.

purposes. *See* 629 Fed.Appx. 52, 53 n.1 (2d Cir. 2015) (stating that a Tsalot-Kob is "a hemispheric head cap that can be made of cloth, knitted or crocheted" and "measures approximately 12" long at its longest point in order to cover all [dread]locks").

After the Second Circuit's mandate was filed in 2016 (Dkt. #173), defendants moved for summary judgment. (Dkt. #194.) Plaintiff then cross-moved for summary judgment. (Dkt. #199.) Those motions were accompanied by declarations of the parties and other evidence, which collectively have substantially fleshed out the factual record, in accordance with the Second Circuit's directives.

## BACKGROUND

The relevant factual background has been set forth in the above-cited decisions, and in this Court's 2011 decision granting in part defendants' motion to dismiss. 760 F.Supp.2d 296. Familiarity with those decisions is assumed, but the Court will briefly summarize the pertinent facts.

Plaintiff's request to be allowed to wear a Tsalot-Kob was denied in 2007 because at the time of his request, he had registered his religious affiliation as "Jewish." At that time, DOCS Directive 4202 provided that Tsalot-Kobs were "approved religious headwear [only] for members of the Rastafarian religious faith." Dkt. #194-7 Ex. A § M(1)(c). DOCS officials had decided, based on advice from the New York State Board of Rabbis, that the only appropriate head covering for Jews was a yarmulke. 629 Fed.Appx. at 55.

Plaintiff "contend[ed] that wearing a religious crown [was], in his sincere belief, consistent with his religious beliefs, and that the wearing of a yarmulke over his dreadlocks as an

2

alternative was at best, impractical, and at worst, impossible." 2014 WL 11460504, at *5. In my 2014 decision, this Court "conclude[d] that the DOCS restriction at issue, insofar as it was enforced to prevent plaintiff from adopting the religious crown specific to plaintiff's sincerely-held beliefs, and permitted by DOCS for use by other religious adherents, violated plaintiff's free exercise rights under the First Amendment and RLUIPA." *Id.* at *6.

This Court also held, however, that all the defendants were entitled to qualified immunity, "[b]ecause no clear case law existed in 2004 which would have informed the individual defendants that the policies at issue were unconstitutional or violative of RLUIPA when applied to plaintiff ... ." *Id.* at *7.

On appeal, the Second Circuit agreed with this Court that "there is no legitimate reason for DOCS to afford members of only one religious denomination the opportunity to adhere to a sincerely held religious belief relative to grooming or headwear," 629 Fed.Appx. at 56 (internal quotes omitted), but the court held that there were issues of fact as to the individual defendants' qualified immunity. The court remanded for further proceedings, as explained in greater detail in the Discussion, *infra*.

The court also affirmed this Court's holding that Barnes's requests for injunctive and declaratory relief are moot. The Court stated that "Barnes's claims [for equitable relief] are moot because he has since changed his religious designation to Protestant and no longer has dreadlocks," and thus no need for a Tsalot-Kob. *Id.* In addition, the court noted that DOCS has changed its policy, to remove the limitation that Tsalot-Kobs can only be worn by Rastafarians. *See id.* at 55; Def. App. Brief Dkt. #100 at 56 (stating that "[i]n an effort to ensure compliance with RLUIPA, inmates will no longer be required to pick faith specific items for **individual**

3

**worship only**") (emphasis in original).  And by his own admission, plaintiff's crown was returned to him in January 2008.  *See* Dkt. #199 at 3 ¶ 14; Dkt. #194-8 at 4.  Thus, the only remaining issue is whether the defendants can be held liable for damages, for the temporary denial to plaintiff of a Tsalot-Kob, or whether they are entitled to qualified immunity on that claim.

**DISCUSSION**

Qualified immunity shields a government official from liability for civil damages "if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).  The Court "must look to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford v. McGinnis*, 352 F.3d 582, 596-97 (2d Cir. 2003) (internal quotation marks omitted).

The Second Circuit has held that "a defense of qualified immunity ... is a defense that often can and should be decided on a motion for summary judgment," *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013) (internal citations and quotation marks omitted).  As stated, there has now been discovery in this case related to that defense.  *See also Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) ("If there is no material question of fact, the court decides the qualified immunity issue as a matter of law"); *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)

("The better rule, we believe, is for the court to decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment when possible ...").

The qualified immunity defense in this case largely turns on two considerations: whether the statutory or constitutional right in question was clearly established at the time of the alleged violation, and, if so, whether it was objectively reasonable for the individual defendants to believe that their actions were constitutionally permissible. *See Barnes*, 629 Fed.Appx. at 56.

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, __ U.S. __, 138 S.Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (additional internal quotes omitted). The Supreme Court has also stated that the defense of qualified immunity provides "ample room for mistaken judgments," *Malley v. Briggs*, 475 U.S. 335, 343 (1986), and protects "all but the plainly incompetent or those who knowingly violate the law," *id.* at 341. *Accord Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017); *Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014); *Harman v. Pollock*, 586 F.3d 1254, 1261 (10th Cir. 2009).

Before a court can determine if the relevant law was clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Indeed, "[t]he Supreme Court has 'repeatedly told courts ... not to define clearly established law at a high level of generality.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (quoting *al-Kidd*, 563 U.S. at 742). *Accord Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010). "While the Supreme Court 'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional

question beyond debate.'" *Reed v. Sheppard*, __ F.Supp.3d __, 2018 WL 3962819, at *10 (W.D.N.Y. 2018) (quoting *Mullenix v. Luna*, __ U.S. __, 136 S.Ct. 305, 308 (2015) (additional internal quotes omitted).

In the case at bar, the Court of Appeals held that its "earlier decisions ha[d] clearly established that prison officials may not prohibit a sincere religious practice without some legitimate penological interest." 629 Fed.Appx. at 56. The court also stated that it was "clearly established before 2007 [when plaintiff's crown was confiscated] that prison officials could not rely solely on the opinions of the New York Board of Rabbis in assessing the sincerity of Barnes's religious belief," and that " the test for whether a prisoner's beliefs are entitled to free exercise protection turns on whether they are 'sincerely held,' not the ecclesiastical question of the propriety of Jews wearing head coverings other than yarmulkes." 629 Fed.Appx. at 56.[2]

"Even so," the court added, "there remains the question of whether 'reasonable persons in [defendants'] position would not have understood that their conduct was within the scope of the established prohibition.'" *Id.* (quoting *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998)) (additional internal quote omitted). As to that question, the court drew a distinction between those who *follow* an established policy, and those who are responsible for the *creation* of the policy.

The Court of Appeals did not expressly state that the defendants who confiscated plaintiff's Tsalot-Kob were entitled to qualified immunity, but the court's decision plainly

---

[2]For the purposes of this Decision and Order, the Court assumes that plaintiff's expressed religious beliefs have been sincerely held, throughout the relevant time frame. But I note–as did the Court of Appeals–that "at various times, Barnes was registered as Muslim, Hebrew Israelite, Jewish, Rastafarian, Protestant, and Nation of Islam." 629 Fed.Appx. at 55 n.2. His beliefs, however sincere, appear to have changed with remarkable frequency.

focused on the adoption of the policy embodied in Directive 4202, rather than on the implementation of that policy in this instance. The court stated that "[w]hile the individual corrections officers who confiscated Barnes's Tsalot-Kob may very well have been acting reasonably when following DOCS policy, a different analysis may apply to those responsible for the policy. On this record, it is not apparent whether there was a legitimate penological reason to limit only Tsalot-Kobs to inmates registered as Rastafarian." *Id.* at 57.

Of the remaining defendants, only defendant Nuttall, who is identified as a Deputy Commissioner of Program Services, had anything to do with the creation of the policy in question. Nuttall "signed off" on Directive 4202 in 2004, indicating his endorsement of it. Levine Decl. (Dkt. #194-7, Ex. A.) Defendants Fedele, Furman and Murphy are alleged to have confiscated plaintiff's crown. Defendants Stanley, Chappius and Bartlett reviewed and denied plaintiff's requests for the return of his crown. But other than Nuttall, none of those other defendants were involved in the creation or adoption of the underlying policy.

In the context of the record then before it, the Second Circuit stated that it could not find, as a matter of law, that it was objectively reasonable for the persons responsible for the underlying policy to believe that denying a Tsalot-Kob to an inmate registered as Jewish was constitutional. The court did *not* find, however, that it was objectively *un*reasonable for those persons to believe such.

Rather, the court held that on the record as it then existed, the court could not decide that question at all. The court explained that defendants, up to that point, had not "provide[d] any legitimate penological reasons behind prison officials' and chaplains' former adherence to a policy that limited Jewish inmates' head coverings to yarmulkes only," or "for deferring to the

7

New York State Board of Rabbis where the sincerity of Barnes's belief was apparently uncontested." 629 Fed.Appx. at 56. As stated, the court remanded the action to this Court, for further development of the record as to those matters. Thus, the court left open the possibility that on a fuller record, it might be possible to determine as a matter of law whether defendants–including those responsible for the policy–had a legitimate penological reason for the policy, at least sufficient to entitle them to qualified immunity.

Following the Second Circuit's remand, and in support of their present motion, defendants have stated that the reason for the policy was that Tsalot-Kobs can easily be used to hide contraband, such as drugs and weapons. For that reason, DOCS sought to limit the number of inmates who were allowed to wear Tsalot-Kobs. As defendants put it in their Rule 56 Statement, "[t]he more inmates wearing crowns, the longer it takes to search the inmate population to find the contraband." (Dkt. #194-1 ¶ 7.) Therefore, defendants say, the policy "was designed to make the operation of the correctional facility more efficient." *Id.*

By any measure, reducing the risk of smuggled-in contraband is a legitimate penological objective. *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (controlling the flow of contraband is a legitimate penological interest); *Stoudemire v. Michigan Dep't of Corrections*, 705 F.3d 560, 573 (6th Cir. 2013) ("Unquestionably, 'detect[ing] and deter[ring] the possession of contraband' is a legitimate penological objective") (quoting *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328 (2012)). Thus, defendants having proffered that legitimate reason for the policy, the chief question before this Court is whether defendants could reasonably have thought that the means they adopted or used to effect those ends were constitutionally permissible. I find, as a matter of law, that they could have.

The fact that this Court and the Court of Appeals later found that the policy of limiting crowns to self-identified Rastafarians, and allowing only yarmulkes for Jews, violated plaintiff's First Amendment rights, does not mean that the defendants–even those responsible for the policy–are not entitled to qualified immunity. The whole point of qualified immunity is that in certain circumstances, a defendant can be immune from liability *in spite of* a constitutional violation; in other words, the application of the doctrine presumes that there has been a violation of the plaintiff's rights, in the first place. *See Duffy v. Wallace*, __ Fed.Appx. __, 2018 WL 4378660, at *1 (2d Cir. 2018) (citing *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)).

In the instant case, it appears that defendant Nuttall signed off on Directive 4202 (as applied in this case) in May 2004. (Dkt. #194-7, Ex. A.) The Second Circuit held in this case that by that date, its "earlier decisions ha[d] clearly established that prison officials may not prohibit a sincere religious practice without some legitimate penological interest." 629 Fed.Appx. at 56.[3] The court stated that it could not "say as a matter of law that it was objectively reasonable for [the persons who created the policy] to believe that denying a Tsalot-Kob to an inmate registered as Jewish was constitutional. Moreover, because defendants have not identified any penological interests supporting the policy, we cannot assess the reasonableness of their actions." *Id.* at 57.

---

[3]Although Nuttall signed the directive in 2004, three years before plaintiff's crown was confiscated, the cases cited by the Second Circuit in support of its conclusion that the right in question was well established were decided in the 1990s, *see* 629 Fed.Appx. at 56, so the three-year gap between the enactment of the policy and its application to plaintiff is of no moment.

As stated above, defendants have now identified penological reasons for the policy underlying Directive 4202, insofar as it relates to the restrictions on Tsalot-Kobs. Until this Court and the Court of Appeals held that a policy restricting Tsalot-Kobs to Rastafarians is constitutionally infirm, Nuttall could reasonably have believed that such a restriction was constitutionally permissible, given the legitimate penological interest in reducing the risk of smuggling contraband into prisons. The policy was apparently intended to accommodate inmates' religious rights, while still taking account of genuine and serious security needs. That Nuttall may not have foreseen courts' eventual disapproval of that policy on constitutional grounds does not make his endorsement of the policy objectively unreasonable.

And as noted above, the Supreme Court has cautioned that courts must take care to define the right in question at an "appropriate level of specificity." *Wilson*, 526 U.S. at 615. Ordinarily, "the unlawfulness [of government conduct] must be apparent" "in the light of pre-existing law." *White v. Pauly*, __ U.S. __, 137 S.Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, at 640 (1987)); *Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017) (noting that court must identify precedent with sufficiently "similar circumstances" in order to find law is clearly established). In determining whether the relevant law is "clearly established," courts "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014).

That is not to say that defendant is entitled to immunity unless a prior case from the Supreme Court or the Court of Appeals previously decided a case "on all fours" with this one, or involving the precise issue now before the court. But it does mean that in determining whether a

defendant is entitled to qualified immunity, a court should consider whether the specific right in question had been addressed by the courts, especially the Supreme Court and the relevant court of appeals. In this case, it does not appear that any higher courts had held, prior to Nuttall's "signing off" on Directive 4202, that religious headwear could not lawfully be restricted to members of particular religions. Nuttall cannot be held accountable in damages for failing to prognosticate that courts might later so hold.

As to the other defendants, Fedele, Furman and Murphy are alleged to have confiscated plaintiff's crown. Defendants' declarations are consistent with that allegation. Fedele states (Dkt. #198) that on January 21, 2007, he saw plaintiff wearing a head covering that he believed was not allowed under Directive 4202. He reported this to Sergeant Furman, who directed him to confiscate the headwear. Defendant Murphy signed a contraband receipt for the crown, which was turned over to defendant Chaplain Stanley (Dkt. #194-5).

In doing so, those defendants were simply following the then-existing DOCS directive. Nothing in the record indicates any reason why they should have questioned the constitutional legitimacy of that directive. Though both this Court and the Court of Appeals later held that the policy was unconstitutional, I find no basis in the record before me to conclude that those defendants acted unreasonably in enforcing Directive 4202.

Defendants Stanley, Chappius and Bartlett reviewed and denied plaintiff's requests for the return of his crown. At the time of the relevant events, Stanley was a (non-Jewish) chaplain at Southport. Based on her review of Directive 4202, she opined that a Tsalot-Kob or crown was not appropriate for followers of the Jewish faith. (Dkt. #194-6.) Chappius, who was the Deputy Superintendent of Security at Southport, informed plaintiff that plaintiff's complaint had been

investigated, and that there was no finding of wrongdoing. Chappius also states that based on his reading of Directive 4202, the confiscation of plaintiff's crown was justified. (Dkt. #194-4.)

Bartlett was a DOCS employee who was a Deputy Superintendent of Programs at Southport. She responded to plaintiff, informing him that in accordance with Directive 4202, he was only allowed to wear a yarmulke, because he had identified himself as a member of the Jewish faith. (Dkt. #194-3.)

As with the defendants who confiscated plaintiff's crown, these defendants acted reasonably under the circumstances, and had no reason to question the constitutional legitimacy of Directive 4202, insofar as it applied to plaintiff. I find as a matter of law that they are entitled to qualified immunity.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #194) is granted. Plaintiff's motion for summary judgment (Dkt. #199) is denied. The complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       October 2, 2018.