UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARRELLO BARNES,

                                Plaintiff,

        v.

FEDELE, et al.,

                                Defendants.
_____

<u>DECISION AND ORDER</u>

07-CV-6197L

### **INTRODUCTION**

*Pro se* plaintiff Arrello Barnes ("Barnes") filed this lawsuit in 2007, while he was confined at Southport Correctional Facility ("Southport"), alleging claims pursuant to 42 U.S.C. § 1983, based on the Free Exercise Clause of the First Amendment, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, against various officials and employees of the New York State Department of Corrections and Community Supervision ("DOCCS")[1]. (Dkt. ## 1; 89 at 4).

Since that time, various decisions from this Court and the Court of Appeals for the Second Circuit have whittled down both the number of claims and the number of defendants. *See Barnes v. Fedele*, 2014 WL 11460504 (W.D.N.Y. 2014) (the "2014 Decision"), *aff'd in part & vacated in part sub nom.*, *Barnes v. Furman*, 629 F. App'x 52 (2d Cir. 2015) (summary order) (the "2015

---

[1] All relevant events in this case occurred when DOCCS was known as the New York State Department of Correctional Services ("DOCS"). In each of my prior decisions regarding Barnes's claims, I therefore chose to refer to this entity as "DOCS." When Barnes last appealed, however, the Second Circuit used "DOCCS" when referring to this entity. For consistency, I will now do the same herein.

Decision"); *Barnes v. Fedele*, 337 F. Supp. 3d 227 (W.D.N.Y 2018) (the "2018 Decision"), *aff'd in part & vacated in part*, 813 F. App'x 696 (2d Cir. 2020) (summary order) (the "2020 Decision"), *cert. denied*, 141 S. Ct. 884 (2020); *see also Barnes v. Fedele*, 760 F. Supp. 2d 296 (W.D.N.Y. 2011). Familiarity with this case's factual background discussed in these prior decisions and its lengthy procedural history are assumed, and will be discussed only in relevant part, *infra*.

As it stands now, Barnes's remaining claim concerns DOCCS's denial to him of the opportunity to wear his Tsalot-Kob (religious headwear also referred to as a "crown") while at Southport in 2007, a determination made pursuant to a version of DOCCS Directive 4202 (the "Directive") effective at that time. The last defendant remaining in this case is John Nuttall ("Nuttall"), the former Deputy Commissioner for Program Services for DOCCS, who signed the Directive on May 12, 2004. Of all the original defendants, Nuttall is the only one who was involved in the creation of the Directive.

Pending now is Nuttall's motion for summary judgment and Barnes's cross motion for summary judgment, both filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. ## 219; 221). The principal issue raised in each motion is, again, whether Nuttall is entitled to qualified immunity for his role in the creation of the Directive. More to the point, the Court must decide whether it was objectively reasonable for Nuttall to believe, when he signed the Directive in 2004, that the Directive was lawful.

For the following reasons, I find that Nuttall is entitled to qualified immunity as a matter of law, and therefore grant his motion for summary judgment. Barnes's cross motion for summary judgment is denied and his complaint is therefore dismissed.

# BACKGROUND[2]

### A. Facts

#### 1. Nuttall and DOCCS Directive 4202

In his position as Deputy Commissioner of Program Services for DOCCS, Nuttall was responsible for "overseeing the drafting and reviewing of directives pertaining to DOCCS Program Services." (Dkt. # 219-4 at ¶¶ 3, 5). This included oversight of "directives pertaining to religious headwear," such as Directive 4202, entitled "Religious Programs and Practices." (*Id.* at ¶¶ 5, 13; *see also* Dkt. # 219-2). Although Nuttall has "no independent recollection of drafting" the Directive (Dkt. # 219-4 at ¶ 14), it is clear that he signed it on May 12, 2004 (*see* Dkt. ## 219-6 at ¶ 1; 221 at 2, ¶¶ 1, 3).

Section "M" of the Directive regulated inmates' wearing of religious headwear, examples of which included Kufis, Yarmulkes, Tsalot-Kobs, Fezzes, and Khimars, and "permitted [inmates] to wear religious headcoverings in accordance with their religious beliefs and as permissible in a correctional setting." (Dkt. ## 219-2 at 7; 219-6 at ¶¶ 5, 9). In relevant part, this section of the Directive only permitted inmates who were members of the Rastafarian faith to wear Tsalot-Kobs, described as "hemispheric head cap[s] that can be made of cloth, knitted or crocheted," and which "measure[] approximately 12 [inches] long at [their] longest point in order to cover all [dread]locks." (Dkt. ## 219-2 at 7; 219-6 at ¶ 6).

---

[2] The following facts, which are undisputed unless otherwise noted, are drawn from the parties' Rule 56 Statements and relevant exhibits cited therein, which include evidence in the record that was submitted on previous summary judgment motions, (*see* Dkt. ## 219-6 (Nuttall's Rule 56 Statement); 221 at 2 (Barnes's Rule 56 Statement); 224-1 (Nuttall's response to Barnes's Rule 56 Statement)), as well as the prior decisions cited above. I note that neither party submitted a proper statement of facts pursuant to Rule 56(a) of the Local Rules of Civil Procedure. For instance, and rather unhelpfully, few of Nuttall's statements (and none of Barnes's statements) are supported with citations that "identify with specificity the relevant page and paragraph or line number of the evidence cited." W.D.N.Y. LOCAL R. CIV. P. 56(a)(1). Moreover, Barnes entirely failed to submit a statement opposing Nuttall's statement of facts, *see* W.D.N.Y. LOCAL R. CIV. P. 56(a)(2), even though he did submit a Rule 56 Statement in support of his own motion. These technical errors notwithstanding, after reviewing the parties' papers and the relevant portions of the record, it is clear that they do not dispute the facts material to the resolution of the remaining issues in this case.

According to Nuttall, "[o]ne purpose of the Directive[] was to maintain the safety and security of the correctional facility, while at the same time allowing incarcerated individuals the right to practice their religion." (Dkt. # 219-4 at ¶ 15). As Nuttall explains, "[h]ead coverings of any kind pose a potential risk to staff and incarcerated individuals at the correctional facility" because "[c]ontraband, including weapons, may be concealed in head coverings or in an individual's hair." (*Id.* at ¶ 16). Thus, Nuttall continues, "[t]he Directive[] w[as] drafted in an effort to balance safety and security with the ability of incarcerated individuals to freely practice their religion." (*Id.* at ¶ 17). In his summary judgment submissions, Barnes does not dispute any of these representations.

Nuttall also states that the Directive was drafted "with the aid of legal counsel, namely DOCCS Office of Counsel, and [he] relied on their legal advice," as well as in "coordination with religious leaders of all faiths, including the Board of Rabbis, Council of Churches and Catholic Conference of New York." (*Id.* at ¶¶ 19-20). In 2007, Nuttall believed that the Directive was "in full compliance with the Constitution of the United States." (*Id.* at ¶ 18).

### 2. **DOCCS's Denial to Barnes of his Tsalot-Kob**

As of August 15, 2006, and continuing through the relevant period, Barnes was registered with DOCCS as a member of the Jewish faith.[3] (*See* Dkt. # 219-6 at ¶ 10). On that basis, certain of the former defendants confiscated Barnes's Tsalot-Kob in January 2007 and provided it to then-Southport Chaplain Theresa Stanley. (*See id.* at ¶¶ 11-15). Stanley "advised that the confiscated [Tsalot-Kob] was not the proper headwear for a Jewish inmate," and that because Barnes was registered as a member of the Jewish faith, "only a yarmulke was approved [as religious headwear], not a Crown." (*Id.* at ¶¶ 16, 18).

---

[3] As the Second Circuit has noted previously, "at various times, Barnes was registered as Muslim, Hebrew Israelite, Jewish, Rastafarian, Protestant, and Nation of Islam." *Barnes*, 629 F. App'x at 55 n.2.

Barnes filed several prison grievances regarding the confiscation of his Tsalot-Kob, complaining in part that a "Yarmulk[e] [was] too small to fit on [his] dreadlocks," and that "[a]s a Jewish person [he] must keep [his] headcover [on] all [the] time." (Dkt. # 121 at 304). *See also Barnes*, 629 F. App'x at 55 (noting Barnes's contention "that a Tsalot-Kob was more appropriate than a yarmulke because it fit over his extensive dreadlocks"). Barnes's grievances were ultimately denied because the Directive only permitted Rastafarian inmates to wear Tsalot-Kobs, and Barnes was not registered as Rastafarian. (*See* Dkt. # 219-6 at ¶ 20).

Throughout January and February 2007, Barnes also wrote several letters to various DOCCS officials and employees concerning the denial of his ability to wear a Tsalot-Kob, including Nuttall. (*Id.* at ¶ 21). In response, Nuttall informed Barnes, among other things, that according to DOCCS's religious advisors, the New York State Board of Rabbis, the "religious head covering for the Jewish faith [was] a yarmulke." (Dkt. # 219-5 at 1; *see also* Dkt. # 121 at 372-74). Based on this advice, Nuttall believed that the Directive "did not allow Jewish incarcerated individuals [such as Barnes] to wear religious head coverings other than a yarmulke," and that Barnes's wearing of a Tsalot-Kob was therefore not consistent with the Directive. (Dkt. # 219-4 at ¶¶ 21-25).

Barnes previously represented to this Court that DOCCS returned his Tsalot-Kob in January 2008, *see Barnes*, 337 F. Supp. 3d at 230, and DOCCS represented to the Second Circuit that it "has since changed its policy [embodied in the Directive] to remove the limitation that Tsalot-Kobs be worn by Rastafarians only," *Barnes*, 629 F. App'x at 55. This case has therefore focused on the period of time when DOCCS confiscated Barnes's Tsalot-Kob pursuant to a policy that is no longer in effect.

B.     **Procedural History**

1.     **The 2014 Decision**

In 2014, this Court determined that the Directive violated Barnes's free exercise rights under the First Amendment and the RLUIPA "insofar as it was enforced to prevent [him] from adopting the religious crown specific to [his] sincerely-held beliefs, and permitted by [DOCCS] for use by other religious adherents." *Barnes*, 2014 WL 11460504 at *6. I noted at that time that Barnes had "testified as to his sincere belief that the practice of his faith included the wearing of a religious crown, and [DOCCS] d[id] not dispute the sincerity of that belief." *Id.* at *5. Nonetheless, I held that all defendants, including Nuttall, were entitled to qualified immunity on this claim, and granted summary judgment on that basis. *See id.* at *6-7.

Qualified immunity was appropriate, in my view, because there was no "clearly established" law in 2004 "which would have informed the individual defendants that [the Directive] w[as] unconstitutional or violative of RLUIPA when applied to [Barnes]." *Id.* That is, defendants could have reasonably believed that their conduct in denying Barnes his Tsalot-Kob did not violate a clearly established constitutional or statutory right because "[t]here [was] no evidence that any of the defendants had reason to question the propriety of the [Directive] . . . and research reveal[ed] no case law invalidating such [a] regulation[] that pre-existed the facts presented here." *Id.* at *7.

2.     **The 2015 Decision**

The Second Circuit disagreed that each defendant was entitled to qualified immunity as a matter of law for the various roles they played in denying Barnes his Tsalot-Kob. *See Barnes*, 629 F. App'x at 55-57. In doing so, the Circuit initially laid out the right at issue in this case by confirming that its "earlier decisions have clearly established that prison officials may not prohibit

6

a sincere religious practice without some legitimate penological interest." *Id.* at 56. In evaluating the reasonableness of defendants' conduct in the qualified immunity context, the Circuit noted the importance of differentiating between those defendants who merely "follow[ed]" the Directive and the defendants "responsible" for it. *Id.* at 57.

Ultimately, the Circuit's decision to vacate my initial award of summary judgment to defendants on qualified immunity grounds rested on an evidentiary gap in the record that existed at that time; defendants had "not identified any penological interests supporting" the Directive, and it was thus "not apparent whether there was a legitimate penological reason to limit only Tsalot-Kobs to inmates registered as Rastafarian." *Id.* As a result, the Circuit "c[ould not] say as a matter of law that it was objectively reasonable for th[e] defendants to believe that denying a Tsalot-Kob to an inmate registered as Jewish was constitutional," and remanded for further development of the record. *Id.*

### 3.     The 2018 Decision

On remand, it was my view, based on a supplemented factual record and the Second Circuit's reasoning in the 2015 Decision, that each defendant was entitled to qualified immunity on Barnes's claims relating to the denial of his Tsalot-Kob. *See Barnes*, 337 F. Supp. 3d at 231-35. As far as penological interests supporting the Directive, I noted defendants' reliance on the declaration of Paul Chappius ("Chappius") – the Deputy Superintendent of Security at Southport in 2007 – who claimed that "the reason for the [Directive] was that Tsalot-Kobs c[ould] easily be used to hide contraband, such as drugs and weapons" and that DOCCS thus "sought to limit the number of inmates who were allowed to wear Tsalot-Kobs." *Id.* at 233. According to Chappius, "the more inmates wearing crowns, the longer it t[ook] to search the inmate population to find the

7

contraband," and therefore, the Directive "was designed to make the operation of the correctional facility more efficient." *Id.* (brackets and quotations omitted).

As I stated then, "[b]y any measure, reducing the risk of smuggled-in contraband is a legitimate penological objective." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), and *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013)). Still, the "chief question" for qualified immunity purposes was "whether defendants could reasonably have thought that the means they adopted or used to effect those ends were constitutionally permissible." *Id.*

In answering this question in the affirmative, I recognized the distinction drawn by the Second Circuit in the 2015 Decision between Nuttall, who was the only defendant responsible for the creation of the Directive, and all other defendants, whose involvement amounted to following an established DOCCS policy. *Id.* at 232. As for Nuttall, I determined that:

> Until this Court and the Court of Appeals held that a policy restricting Tsalot-Kobs to Rastafarians [was] constitutionally infirm, Nuttall could reasonably have believed that such a restriction was constitutionally permissible, given the legitimate penological interest in reducing the risk of smuggling contraband into prisons. The policy was apparently intended to accommodate inmates' religious rights, while still taking account of genuine and serious security needs. That Nuttall may not have foreseen courts' eventual disapproval of that policy on constitutional grounds [as described in the 2014 Decision] does not make his endorsement of the policy objectively unreasonable. . . .
>
> In this case, it does not appear that any higher courts had held, prior to Nuttall's 'signing off' on Directive 4202, that religious headwear could not lawfully be restricted to members of particular religions. Nuttall cannot be held accountable in damages for failing to prognosticate that courts might later so hold.

*Id.* at 234. I therefore granted summary judgment in favor of Nuttall on the basis of qualified immunity. *See id.* at 234-35.

8

### 4. The 2020 Decision

On appeal, the Second Circuit affirmed the dismissal of this case against all defendants except for Nuttall; all other defendants were protected by qualified immunity. *See Barnes*, 813 F. App'x at 700-701. In doing so, the Circuit reiterated the "clearly established" right at issue, that "[p]risons may abridge [an inmate's free exercise rights] 'if reasonably related to some legitimate penological interests,'" *id.* at 700 (citing *Ford v. McGinnis*, 352 F.3d 582, 594 (2d Cir. 2003)), and agreed that "[p]reventing the flow of contraband in prison is certainly a legitimate penological interest," *id.* (citing *Wolfish*, 441 U.S. at 559-60, and *Sec. & Law Enf't Emps., Dist. Council 82, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Carey*, 737 F.2d 187, 204 (2d Cir. 1984)).

Still, as to Nuttall, the Circuit reasoned that:

> Importantly, Nuttall was the only Defendant involved in creating the Directive, yet he did not provide a declaration explaining the penological purpose behind its creation. Indeed, he did not provide any declaration. Nevertheless, the district court imputed the penological interest articulated by Chappius onto Nuttall. This was error, as nothing in the record sets forth Nuttall's motivation or thinking. As we indicated [in the 2015 Decision], the analysis for the Defendants who merely applied the Directive is different than the analysis for the Defendant who implemented it. It is possible, after all, that Chappius's 'understanding' of the policy was not aligned with Nuttall's reason for signing the Directive. Accordingly, on the record before us, Nuttall is not entitled to summary judgment.

*Id.* at 701 (citations and footnote omitted). The Circuit thus remanded the case "for further proceedings consistent with [its] order." *Id.*

### 5. The Current Procedural Posture

Following the Second Circuit's mandate that was filed on August 18, 2020 (Dkt. # 211), Nuttall renewed his motion for summary judgment on August 23, 2021 (*see* Dkt. ## 215; 217; 219). As referenced above, and unlike defendants' prior motions, Nuttall's renewed motion includes his signed declaration (*see* Dkt. # 219-4), purportedly to resolve the issue identified in the

9

2020 Decision. Barnes filed his cross motion for summary judgment on August 30, 2021. (Dkt. # 221). Both pending motions are opposed. (Dkt. ## 224; 225).

## DISCUSSION

**A.      Legal Standard**

Qualified immunity shields a government official from liability for civil damages "if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). In assessing the applicability of this defense, the court "must look to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford*, 352 F.3d at 596-97 (quotations omitted). The issues on qualified immunity are thus "(1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citation omitted).

"Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citation omitted). "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." *Id.* (quotations omitted).

In this way, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations omitted).

Moreover, the defense of qualified immunity "is often best decided on a motion for summary judgment." *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013) (collecting cases). An official is entitled to summary judgment on qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon*, 66 F.3d at 420 (brackets and quotations omitted). "An officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* at 420-21. Therefore, "if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Id.* at 421.

**B.    Analysis**

At the outset, I note that I do not read the 2020 Decision as entirely foreclosing the possibility of Nuttall's entitlement to qualified immunity as a matter of law. Much like the 2015 Decision, the 2020 Decision's analysis with respect to Nuttall focused on an evidentiary gap in the record as it then existed – specifically, the absence of any declaration from Nuttall, himself, "explaining the penological purpose behind" the Directive – which the Second Circuit believed prevented it from assessing the reasonableness of Nuttall's involvement in the creation of the Directive. *Barnes*, 813 F. App'x at 701. Without any such evidence, the Circuit expressed concern

over "imput[ing] the penological interest [supporting the Directive] articulated by Chappius onto Nuttall." *Id.* Given the difference between the former defendants, such as Chappius, "who merely applied the Directive," and Nuttall, who endorsed the Directive, it was "*possible* . . . that Chappius's 'understanding' of the policy . . . was not aligned with Nuttall's reason for signing the Directive." *Id.* (emphasis supplied). So, at the time of the Circuit's 2020 Decision, there was an evidentiary gap in the record concerning Nuttall's reasoning and rationale for implementing the Directive.

That evidentiary gap has now been closed. Nuttall's declaration submitted in support of his summary judgment motion clearly sets forth the purpose for creating the Directive in 2004. In my view, this new evidence warrants a finding that Nuttall is shielded by qualified immunity on Barnes's First Amendment and RLUIPA claims.

As mentioned, the evidentiary record is more complete and developed to specifically include a declaration from Nuttall. (*See* Dkt. # 219-4). Significantly, Nuttall's declaration explains that at least one of the purposes underlying the Directive was to "maintain the safety and security of the correctional facility, while at the same time allowing incarcerated individuals the right to practice their religion." (*Id.* at ¶ 15). "[A]ny kind" of head covering, Nuttall states, "pose[s] a potential risk to staff and incarcerated individuals at the correction facility," because "[c]ontraband, including weapons, may be concealed in head coverings or in an individual's hair." (*Id.* at ¶ 16). Nuttall confirms that the Directive was thus aimed to "balance safety and security with the ability of incarcerated individuals to freely practice their religion." (*Id.* at ¶ 17).

Based on the amplified record, I am still of the view that Nuttall is entitled to qualified immunity for his role in the creation of the Directive in 2004. For purposes of this analysis, the relevant question is whether it was objectively reasonable for Nuttall to believe that the Directive

was constitutionally permissible when he signed it over seventeen years ago, in light of the penological interest he proffers as justification for the Directive. *See Barnes*, 813 F. App'x at 700; *Barnes*, 629 F. App'x at 56-57. For many of the same reasons I discussed in my 2018 Decision, I find that it was objectively reasonable for Nuttall to have believed this.

Nuttall has now confirmed – from his own perspective and in his own words – that the Directive was developed to balance dual interests: safety and security concerns in the prison setting, such as the concealment of contraband, including weapons, in inmates' head coverings, on the one hand, and inmates' ability to freely practice their religion, on the other. It follows from this express rationale that the limiting of Tsalot-Kobs to only inmates of the Rastafarian faith (and, by extension, denying the ability of non-Rastafarian inmates to wear Tsalot-Kobs), as the Directive did at the relevant time, was designed, at least in part, to curb the risks associated with the concealment and presence of contraband in prison, as well as, naturally, the effort necessary to search for any such contraband. Nuttall's reason for signing the Directive thus effectively mirrors Chappius's previously articulated understanding for the Directive, who was well aware of safety and security concerns in the prison setting as Deputy Superintendent of Security at Southport. (*See* Dkt. # 219-6 at ¶¶ 7-8 (referencing Dkt. # 194-4 at ¶ 11)). Accordingly, the Directive served a legitimate penological interest. *See Barnes*, 813 F. App'x at 700 ("[p]reventing the flow of contraband in prison is certainly a legitimate penological interest") (citing *Wolfish*, 441 U.S. at 559-60, and *Carey*, 737 F.2d at 204).

Moreover, it was reasonable for Nuttall to believe, at the time he signed it, that the Directive struck the appropriate balance between the important interests at stake and was lawful. Nuttall relied on the advice and counsel of DOCCS Office of Legal Counsel and "religious leaders of all faiths" in signing the Directive. (Dkt. # 219-4 at ¶¶ 19-20). In addition, as I have previously

13

observed, at the time Nuttall signed the Directive, "it does not appear that any higher courts had held . . . that religious headwear could not lawfully be restricted to members of particular religions." *Barnes*, 337 F. Supp. 3d at 234.

Given, then, that the Directive was rooted (according to Nuttall, himself) in a legitimate penological interest, and in spite of the fact that the Directive was eventually found to violate Barnes's constitutional and statutory rights[4], Nuttall could reasonably have believed in May 2004 that the restrictions contained in Directive were constitutionally permissible.

Accordingly, I find that "no reasonable jury . . . could conclude that it was objectively unreasonable for [Nuttall] to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon*, 66 F.3d at 420. Therefore, I grant Nuttall's motion for summary judgment on qualified immunity grounds. Furthermore, because Barnes's cross motion for summary judgment is based entirely on the argument that Nuttall is *not* entitled to qualified immunity (*see generally* Dkt. # 221), an argument I reject in this decision, I deny Barnes's motion.

---

[4] As I stated in the 2018 Decision, "[t]he fact that this Court and the Court of Appeals later found that the policy [embodied in the Directive] of limiting crowns to self-identified Rastafarians, and allowing only yarmulkes for Jews, violated [Barnes's] First Amendment rights, does not mean that the defendants – even those responsible for the policy [*i.e.*, Nuttall] – are not entitled to qualified immunity." *Barnes*, 337 F. Supp. 3d at 233. "The whole point of qualified immunity is that in certain circumstances, a defendant can be immune from liability *in spite of* a constitutional violation; in other words, the application of the doctrine presumes that there has been a violation of the plaintiff's rights, in the first place." *Id.* (emphasis in original) (citing *Duffy v. Wallace*, 737 F. App'x 591, 591-92 (2d Cir. 2018) (summary order)).

**CONCLUSION**

For all the reasons stated above, Nuttall's motion for summary judgment (Dkt. # 219) is granted. Barnes's cross motion for summary judgment (Dkt. # 221) is denied. The sole remaining part of Barnes's complaint is, therefore, dismissed with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
December 21, 2021.